Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY MARESCA, L&G RUBIN FAMILY TRUST, LING LI, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SOUFUN HOLDINGS LIMITED, VINCENT TIANQUAN MO and LANYING GUAN,<br><br>Defendants. | Case No: 15-cv-08508-CAS-JEM<br><br>Hon. Christina A. Snyder<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Anthony Maresca, and named Plaintiffs L&G Rubin Family Trust and Ling Li (together "Plaintiffs"), by and through their undersigned attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which included without limitation: (a) review and analyses of regulatory filings made by SouFun Holdings, Inc. ("SouFun" or the

"Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, conference calls and media reports issued and disseminated by SouFun; (c) investigative interviews with persons having first-hand knowledge of the Company's operations, including former employees of SouFun; and (d) review of other publicly available information, analyst reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of purchasers of SouFun's American Depository Shares ("ADS") between May 20, 2015 and October 27, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act").

2. SouFun is China's leading real estate Internet portal. SouFun was founded in 1999 by CEO Tianquin "Vincent" Mo. Prior to 2015, SouFun operated as an online business only, functioning primarily as a website for real estate listings all throughout China.

3. When SouFun's business began to perform badly in mid-2014 due primarily to a downturn in China's real estate market and boycotts by companies who no longer wanted to pay high fees to list their properties on SouFun's website, SouFun decided transform is business, going from a completely online listing platform to a company that actually dealt directly in sales and rentals of new and resale properties just like the traditional brick and mortar real estate agencies whose property listings appeared on SouFun's website.

4. SouFun, headed by its aggressive, hands-on CEO began the process of rapidly transforming its business in 2015. SouFun and Mo were determined to transform the Company into a full service brokerage company that offered

brokerage services for new home and resale home properties as well as brokerage services for residential rentals throughout China. In order to rapidly transform its business, SouFun hired 11,000 new employees. 8,000 of the new employees were brokers hired in the rental brokerage business. SouFun was able to attract so many rental brokers by offering them salaries far above market rate.

5. To measure the success of its direct brokerage business, SouFun began reporting a new metric in its financial statements: GMV, which stands for "gross merchandise value," a non-GAAP measure of how fast an internet commerce company is growing and is thought to be a more accurate reflection of the strength of its online business than revenue alone. For this reason, during the Class Period, analysts, investors and SouFun management paid very close attention to the Company's GMV.

6. In the first and second quarters of 2015 SouFun's business transition appeared to be a success, given that its GMV was rapidly growing month by month. Despite the fact that SouFun's earnings were down, investors and analysts were enthused about SouFun, attributing its earnings misses to the capital expended to hire new employees to implement its business transformation.

7. Since the very start of SouFun's entry into the direct brokerage business in the beginning of 2015, widespread fraud existed in SouFun's rental brokerage business whereby rental brokers were given impossibly high sales targets and encouraged by managers to completely fabricate rental brokerage contracts. The revenue from these fake rental brokerage contracts was reported in SouFun's financial statements in both its revenue figures and GMV.

8. Defendants touted the growth in the Company's GMV and success in the rental brokerage area in spite of their knowledge of the ongoing and pervasive fraud that existed. For example, during a conference call with analysts and investors to discuss the Company's financial results for the 2015 fiscal second quarter ("Q2 2015"), Defendant Mo stated *"we have been doing over 45,000*

*transactions in the rental part…because of the high volumes of transactions, there it will bring some multiple value-added services to us.*" According to one confidential source, approximately 95% of SouFun's employees in the rental division- in all of the cities in which it operated- were fabricating rental contracts.

9. On October 27, 2015 popular investor website SeekingAlpha broke a news story reporting that several media outlets in China reported that widespread layoffs were occurring at SouFun as a result of fake rental contracts and that SouFun management were aware that these fake transactions were taking place.

10. Following this revelation, SouFun's stock fell $0.26 per share, or 3.67%.

11. Although SouFun attempted to spin the fraud as having occurred without the knowledge of management and stated that since the inception of the business transformation SouFun has had a "zero tolerance" policy for fraud and monthly human resources meetings, confidential witnesses stated that SouFun created an "anti-corruption" office only *after* the fraud was revealed publicly in a transparent attempt to distance management from involvement in the widespread fraudulent practices. Indeed, according to one confidential source, SouFun's rental brokerage business no longer exists, demonstrating that it was able to appear successful only by virtue of its pervasive fraudulent practice of creating rental contracts out of thin air.

## II. JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**III. PARTIES**

16. Court appointed Lead Plaintiff Anthony Maresca, as set forth in his PSLRA Certification previously filed with the Court and incorporated by reference herein, purchased SouFun ADS during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17. Plaintiff L&G Rubin Family Trust, as set forth in its PSLRA Certification previously filed with the Court and incorporated by reference herein, purchased SouFun ADS during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18. Plaintiff Ling Li as set forth in her PSLRA Certification, annexed hereto and incorporated by reference herein, purchased SouFun ADS during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Defendant SouFun Holdings, Limited was incorporated in 1999 in the British Virgin Islands, and changed is corporate domicile to the Cayman Islands in

2004. Its operational headquarters are located in Beijing China, where it maintains an office at F9M, Building 5, Zone 4, Hanwei International Plaza, No. 186 South 4th Ring Road, Fengtai District, Beijing 100160. SouFun's ADS trade on the New York Stock Exchange under the ticker symbol "SFUN." SouFun describes itself as the leading real estate Internet portal in the People's Republic of China ("China").

20. Defendant Vincent Tianquin Mo ("Mo") is the Chairman and CEO as well as the founder of SouFun. Mo is also a member of SouFun's Nominating and Corporate Governance Committee and a member of SouFun's board's Compensation Committee. Before founding SouFun Mo worked as an executive at Teleres, a venture of Dow Jones & Co., and AEGON U.S. which provides online commercial real estate information services.

21. Throughout the Class Period, Defendant Mo spoke to investors on quarterly earnings calls. Defendant Mo possessed the power and authority to control the contents of the Company's public filings with the SEC, and signed the Company's Form 6-K's filed with the SEC during the Class Period.

22. Defendant Lanying Guan ("Guan") served as SouFun's Chief Financial Officer ("CFO") during the Class Period. Guan joined SouFun in 2004 and was appointed CFO in 2010. Guan holds a master's degree in accounting from the Central Finance and Economics University and its certified public accountant in China. On January 4, 2016 SouFun announced that Guan would no longer serve as SouFun's CFO and that she was "re-positioned" as the Company's Vice President concentrating on tax planning and government relations management.

23. Throughout the Class Period, Defendant Guan spoke to investors on quarterly earnings calls and possessed the power and authority to control the contents of the Company's public filings with the SEC.

24. Defendants Mo and Guan are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of

SouFun's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV. RELEVANT NON-PARTY WITNESSES WITH PERSONAL KNOWLEDGE OF THE RELEVANT INFORMATION ABOUT DEFENDANTS' ACTIONS AND STATE OF MIND

25. Source 1 ("S1") is the former Deputy general manager and president of SouFun's Chengdu branch. S1 worked as the Deputy General Manager and President at SouFun from January 2015 until July 2015.

26. Source 2 ("S2") is a former senior sales manager at SouFun's Shanghai branch. S2 was in the new home sales division and worked as a senior sales manager at SouFun from March 2015 through October 2015.

27. Source 3 ("S3") is a former human resources manager at SouFun's Chengdu branch. S3 worked as the human resources manager at SouFun from June 2015 through January 2016.

28. Source 4 ("S4") is a former sales director at SouFun's Shanghai branch. S4 was a sales director at SouFun from March 2014 through January 2016.

29. Source 5 ("S5") is a former rental broker at SouFun's Guangzhou branch. S5 was a rental broker at SouFun from July 2015 through October 2015. S5 reported to his business team leader, who reported to a working group leader. The leader of S5's working group reported to the general manager of the Guangzhou branch, who reported directly back to the Company's headquarters in Beijing, where information was conveyed directly to top management, including the Individual Defendants.

30. Source 6 ("S6") is a former rental broker at SouFun's Shanghai branch. S6 was a rental broker at SouFun from January 2015 through October 2015. S6 reported to his business team leader, who reported to a working group leader. The leader of S6's working group reported to the general manager of the Shanghai rental branch, who reported directly back to the Company's headquarters in Beijing, where information was conveyed directly to top management, including the Individual Defendants.

31. Source 7 ("S7") is a former rental brokerage team leader in SouFun's rental branch in Nanjing. S7 was a rental brokerage team leader at SouFun from February 2015 through January 2016. S7 reported to his working group leader, who in turn reported to the general manager of the Nanjing branch. The general manager of the Nanjing rental branch reported directly back to the Company's headquarters in Beijing, where information was conveyed directly to top management, including the Individual Defendants.

32. Source 8 ("S8") is a former rental brokerage team leader in SouFun's rental branch in Shenzen. S8 was a rental brokerage team leader at SouFun from February 2015 through October 2015. S8 reported to his working group leader, who in turn reported to the general manager of the Shenzen rental branch. The general manager of the Shenzen rental branch reported directly back to the Company's headquarters in Beijing, where information was conveyed directly to top management, including the Individual Defendants.

## V. BACKGROUND

### *SouFun's Business and the Real Estate Market in China*

33. At the end of 2013 the real estate market in China was performing quite well. For example, in December 2013, new home prices jumped and the average price per square meter for new homes rose 12% from the prior year. This environment allowed SouFun's business model- which at the time was primarily driven by marketing services- to thrive.

34. SouFun, China's largest real estate internet website (the Chinese equivalent to a website like Zillow in the U.S. which lists properties but, (until late 2014) did not directly sell them) depends on the willingness of property brokers and property owners to pay premium rates to list their properties on SouFun's website. In turn, the better the real estate market and the more competition for housing, the more visitors and subscribers SouFun has to its website.

35. Because SouFun's business also derived a significant amount of revenue from advertising, when demand for housing rose SouFun was able to attract more revenue from advertisers. According to SouFun's 2013 Form 20-F filed with the SEC, marketing services (which are comprised primarily of advertisements sold to real estate developers, real estate agencies and other home furnishing and home improvement vendors) was SouFun's largest source of revenues in 2013.

36. Historically, SouFun, despite being an extremely large company, had a relatively low number of employees. As of December 31, 2011, 2012 and 2013 Soufun had 7,600, 7,743 and 9,175 employees, respectively.

37. For the 2014 fiscal year, SouFun's revenue was derived from three primary areas: marketing services, comprising 46.9% of sales; listing services, comprising 22.5% of sales; and e-commerce services, comprising 28.7% in sales.

38. However, in mid-2014 China's home prices began to decline in most cities in China. As new home prices began to drop, so too did SouFun's share price, along with investors' interest in its stock.

39. As China's real estate market experienced a downturn, with lighter transaction volumes in both primary (i.e. new) and secondary (i.e. resale) properties, major offline agencies, the main contributors to SouFun's listing service revenue (about 30% of total revenue) formed an alliance and forced SouFun to cut down the price it charged offline agencies to list its properties on SouFun's website by about 40%. Just one week later, a JPMorgan Asia analyst reported that agents in Shenzen who listed their properties on SouFun were demanding an even further price cut. SouFun also lost some listing business to competitor websites that offered steeper price cuts.

40. By the fall of 2014, the downturn in China's real estate market and declining home prices was having a serious impact on Soufun. In late October of 2014 Bloomberg reported that the share price of SouFun, China's biggest real-estate information website, fell for a third straight day as data showed home priced declined in most cities and new home prices dropped in 69 of the 70 cities tracked by the government in September as compared to August, reporting a "five month slump." As one analyst put it, "The sentiment for SouFun and [another real estate information website] is quite negative."

41. By November of 2014, SouFun's stock price fell to a fourteen month low amid the slump in the property market. As one analyst stated "SouFun's issue is that the industry is in trouble, and their own transition is unstable."

42. In an effort to diversify its business and improve its prospects given the shortfall in revenue caused by among other things, the decline in SouFun's listing service revenue and boycotts SouFun entered into a strategic cooperation agreement with Century 21 China Real Estate Company, a traditional brokerage agency and the leading comprehensive real estate services provider and exclusive

franchisor for the Century 21 brand in China. But in December 2014, SouFun announced that its agreement with Century 21 (which was announced in October) had been terminated because "the parties did not reach agreement with respect to third-party consent to the transaction."

***SouFun's Business Transformation***

43. Faced with the downturn in the real estate market, boycotts from listing agents, and a failed partnership agreement with the largest traditional brokerage agency in China, SouFun was determined to transform itself from an internet based real estate listings company into a full service Chinese real estate company, with a "360 degree" approach that includes interacting with developers, agents, buyers and renters in the primary and secondary Chinese real estate markets.

44. In the beginning of 2015, SouFun launched the Company's online brokerage service which is aimed at establishing SouFun's presence in every part of the transaction in the Chinese secondary real-estate market. SouFun serves as an online intermediary between buyers and sellers, offering services including property listings, advisory services, transaction negotiation and documentation. SouFun also entered the rental market: for the first time offering direct residential rental brokerage services to consumers seeking to lease a home or apartment. SouFun first launched its direct rental brokerage service in five major urban centers in China, including the two largest, Beijing and Shanghai.

45. SouFun described the launch of its real estate online brokerage services in its form 20-F for the fiscal year ended December 31, 2014, filed with the SEC on April 28, 2015: "We launched our real estate online brokerage services in January 2015, which are currently offered in five major urban centers in China, including Beijing, Shanghai, Guangzhou, Chengdu and Wuhan. We plan to gradually expand our services into additional markets. We act as an intermediary between sellers and buyers of secondary real properties, and our services primarily

include property listing, advisory services and transaction negotiation and documentation. In addition to property sales, we also assist property owners and potential renters with leasing transactions. Different from conventional real estate brokers in China, we do not maintain extensive physical sales offices and instead rely primarily on our websites and mobile apps to source customers. We believe this represents a significant cost advantage and allows us to offer competitive commission rates to our customers."

46. However, in order to support its offline brokerage business, SouFun was required to expend an enormous amount of capital hiring 11,000 new employees.

47. SouFun's first quarter 2015 results missed EPS estimates. However, this was not surprising given that the decrease in EPS was a result of the new hiring and advertising expenses in connection with the Company's transformation to an "020" business. 020, which is shorthand for "online retailing to offline retailing" refers to mobile technologies that blend e-commerce with traditional means of selling goods and services.

48. Despite SouFun's slim revenue gain, decline in gross margins, and decline in operating margins in its first quarter 2015 financial statements, which were attributed to the Chinese real estate market slowdown, investors and analysts were excited about the Company's transformation, and were focused not on the Company's revenue growth but on a new metric the Company began to report: GMV, or gross merchandise value.

49. According to a Wall Street Journal article, GMV, a non-GAAP measure, was coined by U.S e-commerce pioneer eBay during the mid-1990's to provide a more accurate reflection of its strength online than revenue alone. "Investors and analysts watch GMV because it's a measure of how fast an Internet commerce company is growing relative to its competitors. In the e-commerce world, GMV is 'the most important measure, ***more important than revenue***,

because it's really the indicator of market position.'" While there is no standard precise definition for GMV, it is generally understood in e-commerce as indicating a total sales value for merchandise sold via an online marketplace over a given period.

50. SouFun's new online brokerage business, which provided direct brokerage services is broken down into three areas: New Home, Secondary Home and Home Furnishing. Its secondary home business is broken down into two areas: secondary home sales (as compared to sales of new homes) and rentals.

51. SouFun seemed poised for success in the direct brokerage business given its competitive advantages compared to other traditional offline agencies, such as its online user traffic advantage: since consumers already knew SouFun as the go-to website for finding real estate listings, utilizing SouFun for direct brokerage services seemed intuitive.

52. Unlike traditional brokerage agencies, which charged 2-3% commission on a given property sale, SouFun charged only 0.5%. For rental transactions, SouFun instituted an unusual policy of taking no fees from the tenants and charging landlords 20% of the value of a rental contract. According to SouFun's CEO Mo, with respect to the rental market commission rates, SouFun was charging from 0-10% of the market price "as a new guy and a new company into this market" to give benefits to end users and consumers in order to penetrate the market as quickly as possible.[1]

53. In its First quarter 2015 financial results SouFun for the first time began to report GMV.

54. On May 20, 2015 SouFun issued its first quarter results reporting the following GMV for the months of January, through April, showing rapid growth in GMV each month as follows:

---

[1] Mo made this statement on SouFun's First Quarter 2015 Earnings Conference Call Transcript, on May 20, 2015.

55. GMV: January-April, 2015 (in millions of US dollars)

| | January | February | March | April | Total |
|---|---|---|---|---|---|
| **New Home *** | 340 | 299 | 642 | 794 | 2,075 |
| **Secondary Home** | 22 | 42 | 320 | 705 | 1,089 |
| **Home furnishing** | 1 | 1 | 2 | 5 | 9 |
| **Total** | **363** | **342** | **964** | **1,504** | **3,173** |

***** Only including direct sales services[2]

56. SouFun reported total GMV for the first quarter of 2015 ended March 31 of $1.7 billion. According to SouFun's first quarter 6-K "Starting from the beginning of this year, the company's e-commerce business expanded into its new home, resale and rental, and home furnishing business lines across China's major cities." CEO Mo stated that in "aggressively penetrating" into this new business "we added more than 11,000 employees with attractive incentives this year to support our e-commerce expansions and we will continue to expand our e-commerce staffs to keep the current momentum."

57. Both analysts and investors were impressed with SouFun's strong debut of its self-operated secondary home agent business. Commenting on

[2] "Direct Sales" services refers to SouFun's promotion of new property developments through its website where potential buyers register free of charge. SouFun then provides users tours, etc., of the new property developments and SouFun charges the developers a fee for each property sold. "Secondary Home" is composed of two segments: 1) direct brokerage services for resale (as compared to new) homes and 2) direct brokerage services for residential rental properties. "Home Furnishing" refers to SouFun's online marketplace platform where third-party merchants sell home furnishing products to customers online. SouFun earns a commission ranging from 5% to 15% of the sales transaction amount from the third-party merchant when the sale is completed.

SouFun's first quarter results, JP Morgan Asia Pacific Equity Research analyst Alex Yao noted "Strong ramp up of self-operated secondary home agency business…value accretive in the long term" and remarked that "SouFun's self-operated agency in secondary homes started off with a strong debut, with total GMV transacted ramped quickly from US $22m/US $42m in January/Feb. 2015 to US $320m in March and US $705m in April." Yao noted that despite the deteriorating margins in 2015/16 "we see a clearer path to value creation in SouFun's investment than other internet names." With respect to the secondary home market, Yao remarked on the strong ramp-up of in-house secondary home transaction GMV, stating "we believe such growth momentum is likely sustainable given 1) Soufun's pricing advantage [in commission rates] which traditional agencies are not likely to match; 2) SouFun's online user traffic advantage; 3) geographic expansion." Yao felt that one of the key catalysts for SouFun's stock price was its "strong ramp up of secondary home agency business."

58. Despite the slim revenue gain, which analysts and investors attributed to the Chinese real estate market slowdown, analysts were focused on SouFun's business transformation. One analyst noted that while the first quarter 2015 EPS missed results, "the new direct sales businesses seem to be gaining traction. SouFun closed $2 billion in gross market value (GMV) of new homes and $1.1 billion of GMV in secondary homes from January to April 2015. ***Most importantly, closings increased every month…The new direct sales products are well positioned to capture a reasonable share of the expanding rental and secondary real-estate markets.*** As a testament to the SouFun strategy, operating cash flow has remained positive even while the company has pumped money into the business." (emphasis added).

59. In SouFun's May 20, 2015 First Quarter 2015 earnings conference call ("Q1 2015 Earnings Conference Call") CEO Mo touted SouFun's successful debut of its new business, emphasizing that he was determined to make the

Company number one in the new home, resale, rental and home furnishing business.

60. With respect to SouFun's rental business, deputy CFO Lei Hua highlighted the numbers concerning SouFun's rental transactions: "SouFun started to provide rental transaction service with free commission fee in Beijing and Shanghai since January. ***In the first quarter, our in-house rental team finished 7,900 city transactions totally in those two cities.***" CEO Mo added "***we have seen very good signs from the local markets like in the rental market in Beijing and Shanghai, we are the number one players now for the rental market***…So to be the number one, number two players across the country, that's definitely the goal in our mind and that's the goal of the Company. So we are moving towards that target."

61. During SouFun's Q1 2015 Earnings Conference Call Defendant Mo fielded a question by an analyst expressing skepticism related to SouFun's secondary home market business:

> Q: "And actually And I do believe many people have this question mark, and I think about you're going to grow this business into a profitable business and big market share and to you look at this market and certainly it's not as appealing as the new home market.
>
> And plus business model wise, you're like almost built from scratch, build up your agencies across the country and lot of things, definitely is not so clear to investors. I want to ask you a question, why you are determined to do this type of business, what do you see in this market that if you said you'll have to do it and how do you mission feel for the future in this part of business and how you will be stationing yourself from others, how you will win this market? That's my question.

Mo responded:

> Resale market is definitely the future of China's property market, so that will become - it is moving in that direction, which is very apparent now. So to emphasize or to put in a resale market as one of our major thing into the future that definitely I think is right for us. ***And since we have started doing this transaction through our online platform we are seeing very good signs in the past four months.***
>
> And we can deliver at a very high growth rate months by months. So it is tough and we started from scratch, but you know, we know how to learn to do things quickly and we also hired, as I mentioned in our press release, ***we hired qualified executives from traditional agency business. And we hired 11,000 people and most of them are experienced agents.***
>
> And by combining SouFun's Internet and mobile advantages and its technology platforms and with traditional brokerage or agency businesses so that is going to make sure that going forward we can move quickly and occupy or take the market share from traditional players in the market.
>
> So with all of those in mind, it is the Company's also myself's determination to move forward definitely without doubt.

62. Commenting on SouFun's first quarter results, JPMorgan analyst maintained its overweight[3] rating of SouFun, despite the fact that SouFun's

[3] An overweight rating by an analyst means the analyst views the stock as an attractive investment, expected to outperform its sector. http://www.investopedia.com/video/play/overweight/

earnings missed expectations, in part due to the "strong ramp-up of in-house secondary home transaction GMV." The analyst noted that SouFun misses its bottom line due to "aggressive investment in headcount (11k in additions YTD) to support business transition" but that the current share price had already factored in the 2015 investment plan, and the ***"strong ramp-up of in-house secondary home transaction GMV* [..] *will likely drive further revenue upside in the near term and stronger long-term earnings power of Soufun."*** (emphasis added).

63. Accordingly, analysts viewed SouFun's secondary brokerage business, of which rentals is one of two component parts, as a critical driver for SouFun's success in the future, as witnessed by the rapid growth rate of GMV in the secondary home area.

64. In the days following the release of SouFun's first quarter earnings, SouFun's stock price rose on the positive prospects for the Company and astounding growth in GMV. Between May 20, 2015 and May 26, 2015 SouFun's stock increased by 17% or $1.02 per share.

65. On August 7, 2015 SouFun announced its Second Quarter 2015 results for the three months ended June 30, 2015. SouFun reported that GMV increased by a whopping 306.7% from $1.7 billion in the first quarter of 2015 to $6.8 billion in the second quarter and provided the following breakdown of GMV per segment on a monthly basis with a table showing the astounding variance:

GMV: January-June, 2015 (in millions of US dollars)

| | **January** | **February** | **March** | **April** | **May** | **June** |
|---|---|---|---|---|---|---|
| **New Home *** | 340 | 299 | 642 | 794 | 1,131 | 1,516 |
| **Secondary Home** | 22 | 41 | 321 | 705 | 1,138 | 1,478 |
| Secondary sales | 20 | 36 | 282 | 637 | 1,002 | 1,324 |
| Rental | 2 | 5 | 39 | 68 | 136 | 154 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Home furnishing** | 1 | 1 | 2 | 5 | 9 | 9 |
| **Total** | **363** | **341** | **965** | **1,504** | **2,278** | **3,003** |

| | 2015Q1 | 2015Q2 | Variance amount | % | |
|---|---|---|---|---|---|
| **New Home *** | 1,281 | 3,441 | 2,160 | 169 | % |
| **Secondary Home** | 384 | 3,321 | 2,937 | 765 | % |
| secondary sales | 338 | 2,963 | 2,625 | 777 | % |
| rental | 46 | 358 | 312 | 678 | % |
| **Home furnishing** | 4 | 23 | 19 | 475 | % |
| **Total** | **1,669** | **6,785** | **5,116** | **307** | **%** |

66. The August 7, 2015 6-K quotes CEO Mo as stating "The Q2 numbers showed that the company is quite on track in its transformation from a pure internet platform to a more transaction oriented platform across new, resale, rental homes and home furnishing plus financial services among China's major cities…I am confident that with our expected funding from IDG and Carlyle, the company will move aggressively and make its transformation successful."

67. With respect to SouFun's rental business, on SouFun's August 9, 2015 second quarter earnings conference call ("2Q 2015 Earnings Conference Call") Defendant Mo discussed the "huge" potential for the rental business specifically. Mo stated that while he initially did not place the rental segment as one of the Company's overall top three critical priorities that had changed given the enormous revenue stream that the rental business could bring:

> **[Analyst]:** "…[W]e actually saw market to pickup in the GMV for the rentals as well in the recent quarters, so can you just give us a little bit color on what are possible revenue streams that we can derive from this rental businesses in the secondary market?

**Vincent Mo:** Well, I am happy to hear from you that you mentioned the rental market. Frankly, rental market, or our rental division, I was not that- at least it's not in my- on our top three things in the business. ***But in the past two months, they changed my attitude and my thinking about the rental market…it could be huge potential…we have been doing over 45,000 transactions in the rental part…because of the high volumes of transactions, there it will bring some multiple value-added services to us…"***

68. On SouFun's 2Q 2015 Earnings Conference Call Mo went on the explain how the rental market would be extremely profitable for SouFun given the fact that many families in China have multiple apartments that they rent out and that SouFun would rent out those apartments for five years collecting 10% of the total annual rent. Coupled with the annual increases in rent, and given that SouFun purportedly already had over 5,000 units under its management, Mo touted the rental business as a very attractive component of SouFun's new business model:

> Because in China, you know, there are many families and people, they have multiple apartments, the homes in the market, they don't – actually, they don't care and they do not even rent out. And we started testing that we can take – they can – they can dedicate or give their apartments in our database and under our management. So, for five years or something, we can make one month rent out of their 12 months rent, so which is about close to 10% of the total annual rental fee. Plus, every year, there will be some rental increase and especially in the big cities in China. ***So, that part becomes very attractive to us now. And currently, we have over 5,000 units under our management. We started only two months ago. So, I would hope that***

> ***someday we can have 0.5 million units or apartments or homes under our management or even 1 million homes under our management***... I think that basically it will be a very profitable business going forward.

(emphasis added).

69. On SouFun's 2Q 2015 Earnings Conference Call, Defendant Mo discussed how SouFun compensated its brokers, stating that SouFun pays its brokers a higher salary than competitors while charging clients a lower commission. He commented on the fact that the volume of transactions per month would enable SouFun to charge customers a lower commission while still remaining profitable: "But as you know, our 0.5% is lower than the traditional agency companies. But we believe because of the efficiencies, things like in the resale market, we are thinking about – we are moving toward three transactions per agent per month, but a traditional agency business agent, they are having one transaction per three months, per quarter. So, that's how are we going to move this transaction business forward."

70. Accordingly, the key to SouFun's profitability in the secondary home market (which includes rentals) was the number of transactions that could be closed by brokers in a given period. Mo also stated, in response to an analyst's question concerning the increase in transactions per agent and efficiency: "this is the key actually to win this market…increase the efficiency of each agent is a tough task for us. ***The good thing is that even after only six months we are better than the average efficiency of this market***."

71. Indeed, analysts viewed the upside potential in the secondary housing market (of which rentals is a part) as the primary basis for looking at SouFun as undervalued when judging it by its earnings performance. An October 7, 2015 analyst report from T.H. Capital LLC stated that: "***SFUN's leadership in the***

***secondary housing market is solidifying and we believe the company should be revalued on a PEG[4] basis as the new business in the secondary housing market is having significant upside potentials.*** As such, we maintain our BUY rating and our price target of $9.00. Since our estimated earnings growth in 2016E would be 118.2% Y/Y, our price target of $9.00 is based on PEG of .25, indicating a 30X PE multiple for our 2016 non-GAAP EPS projection of $0.30."

72. On September 18, 2015 SouFun issued a press release announcing that it had officially entered into the subscription agreement with Carlyle and IDG whereby IDG, Carlyle and management would invest a total of between $400 and $700 million in SouFun stock and convertible notes. Defendant Mo commented that "IDG and Carlyle's financial commitment to [the Company] shows their confidence in [the Company's] management…with the new investment, the company will be in a better position to strengthen its transformation. The company will expand aggressively to more cities and rapidly increase its market share in existing cities with its new transaction and financial service business lines."

***Fraudulent Contracts in SouFun's Rental Brokerage Business are Created to Inflate SouFun's GMV and Revenues and Make SouFun's Transformation Appear More Successful Than it Was***

73. Unbeknownst to investors and the market, at the very inception of SouFun's entry into the rental brokerage business, a large percentage of SouFun's newly hired rental brokers were encouraged to, and did, create completely

[4] PEG stands for price/earnings to growth ratio and is used to determine a stock's value while taking the company's earnings growth into account. The lower the PEG ratio, the more the stock may be undervalued given its earnings performance. A PEG ratio below one is considered desirable because it indicates that a stock is undervalued. *See http://www.investopedia.com/terms/p/pegratio.asp*

fraudulent rental contracts. In fact, according to S1, ***95%*** of SouFun's rental brokers were fabricating contracts.

74. The revenue associated with those contracts was recorded by SouFun and reflected in its GMV and revenue in its SEC filed financial statements.

75. SouFun opened its direct rental brokerage arm in January of 2015, hiring approximately 8,000 rental brokers nationwide, in 11 cities in China. SouFun's rental brokers were paid base salaries of 6,500 RMB per month: much higher than the average salary of 4,000 RMB for rental brokers in China. While there are no legal requirements concerning the length of residential rental leases in China, the majority of leases are for a minimum of six months, and many are one year leases, with renewal conditions, similar to rental leases in the U.S.

76. The hiring of 8,000 rental brokers represented 73% of the 11,000 total employees that were hired in connection with SouFun's business transition in the first two quarters of 2015. Accordingly, a large portion of the funds expended in SouFun's business transition went towards hiring rental brokers.

77. In terms of revenue on residential leases, SouFun charged tenants no commission fee associated with residential leases and charged the landlords 20% of the total lease amount as its fee. For example, if a one year lease was entered into for 500 RMB per month, the commission fee due to SouFun from the landlord would be 20% of 6000 RMB or 1200 RMB.

78. The commissions from landlords to SouFun were due to be paid in total at the time of the signing of the lease. SouFun's rental brokers would report the revenue associated with the commission fees promptly to their managers. The revenues and GMV associated with the commissions from rental contracts, like all other revenues and GMV in SouFun's business divisions, was reflected in SouFun's quarterly financial statements.

79. According to S8, (a former rental business team leader in SouFun's Shenzen branch), SouFun's rental business and the reporting structure within

SouFun's rental business is organized and functions as follows: for each city in China in which SouFun provides rental brokerage services there is one branch. Each branch has one general manager. At each branch there are one or more working groups which are then broken up into business teams- with one team leader for each business team. Each business team leader reports to the leader of the working group, who in turn reports branch's general manager. Each branch manager reports directly back to the Company's headquarters in Beijing, where information is conveyed directly to top management, including the Individual Defendants.

80. According to S7, (a rental business team leader in SouFun's rental branch in the city of Nanjing who worked at SouFun from the inception of the rental brokerage business until it was ended) all of SouFun's rental branches are simply operational offices that execute the decisions of SouFun's top management, namely Defendant Mo. None of the branches participate in decision making, they merely report sales directly to the Company's corporate headquarters in Beijing and receive orders directly from the corporate headquarters in Beijing.

81. S7 recalled that in early 2015 a "delegate" from SouFun's corporate headquarters in Beijing visited the Nanjing office and discussed top management's decision to initiate the rental business. This delegate reported back directly to Soufun's CEO and CFO. Essentially, top management, namely Defendant Mo, wanted to get into the rental business quickly and become number one. Accordingly, management recruited a massive staff of brokers and employees responsible for managing the brokers and heading up the rental teams.

82. SouFun quickly attracted a massive staff of people to work in the rental brokerage business by luring them with high salaries and bonuses, while at the same time doing nothing to train them. Management also did nothing to implement any internal control policies in the rental business or formal procedures that would ensure rental brokers and managers acted appropriately. The rental

business was essentially a free for all consisting of untrained staff lured by high salaries who would expand SouFun's rental business at any cost in order to make the impossibly high sales targets and make it appear that SouFun's rental business was successfully growing.

83. According to S1, the issue of residential rental brokers fabricating or "faking" lease contracts is not uncommon in China and is something that other rental brokerages have experienced. Faking contracts was especially prevalent in companies like SouFun that charged tenants no commission fee on a rental contract. Accordingly, SouFun's management was on notice that because such a practice was so commonplace, rental contracts should be verified, by, for example, contacting the landlord of a given building to make sure that the lease in fact existed.

84. At the behest of their managers, SouFun's rental brokers would fabricate rental contracts utilizing two different methods. The first method involved the use of old rental contracts. Because most of the rental brokers hired by SouFun were previously employed by other residential real estate brokerage agencies and kept rental contracts they closed while at their former employers, these brokers would "revise" the prior contracts, changing only the dates, and pass them off as new ones, reporting commission revenue from completely stale nonexistent contracts.

85. Another method of fabricating contracts consisted of creating two contracts for one transaction. For example, if two tenants shared an apartment, a broker would ask each tenant to sign a separate contract. The broker would then record revenue associated with two contracts rather than one.

86. Regardless of the method for fabricating the contract, revenue associated with a "fake" contract was never actually received by SouFun, since it was only the landlords that were paying commission fees, and the falsifications did not involve for example, charging tenants or landlords excessive or duplicative

commissions. Despite never receiving the revenue from commission fees associated with these fake contracts, the commission fees were nevertheless recorded by SouFun as revenue, and the value of the contracts were recorded under SouFun's reported GMV.

87. While SouFun paid rental brokers a salary that was much higher than the industry standard, rental brokers were given completely unrealistic targets in terms of the number of rental contracts that should be fulfilled in a month. According to one online account by an anonymous 10-year rental broker who was a member of the "Weixin Group", an online community comprised of former SouFun employees who were terminated when SouFun's fraud was revealed, SouFun held monthly reward conferences where brokers who closed 30-40 contracts a month were rewarded. Brokers who closed 20 transactions were considered to be at the bottom in terms of performance, even though closing 20 rental contracts would be considered exceptional at other rental brokerages and in general industry-wide.

88. According to S1, SouFun's upper management was determined to transform the Company from a solely online model into a Company that also provides direct brokerage services, which caused a chaotic operational situation and was also accompanied by the implementation of completely impractical sales targets.

89. A former senior sales manager in SouFun's Shanghai office (S2) concurs, explaining that SouFun offered outstanding compensation packages to attract real estate agents from competitor brokerage companies and that unrealistic sales targets were set by upper management, and that in turn, regional managers instructed rental brokers to fabricate rental contracts in order to meet those targets.

90. "Faking" contracts in SouFun's rental brokerage business was such a prevalent practice, that many rental brokers did not even come to work. According to a former rental broker at SouFun Shanghai (S6), SouFun's policy did not even

require employees to clock into work. Rather than show up for work, many brokers would fax in fake contracts. He gave an example of employees fabricating ten contracts in a given month, generating about 8-10,000 RMB. By June and July of 2015, this practice mushroomed, and while some employees were able to achieve sales targets without falsifying contracts, even those employees would end of fabricating one or two in order to reach the impossibly high sales targets.

91. S7 reports that the upon discovering that fake rental contracts were being submitted in April of 2015 the Nanjing branch general manager reported the issue to SouFun's headquarters in Beijing and received no response or reaction. Accordingly, taking its cue from management, the Nanjing branch did not try to stop the practice. Between April 2015 and July 2015 the "fake contract" issue became "uncontrollable." According to S7, SouFun's public relations department worked to keep the issue from being detected by the media or outsiders and managed to minimize the negative impact of the practice even after it was revealed to the public.

92. A rental team leader in SouFun's Shenzen rental brokerage branch (S8) tells a similar story. SouFun's rental brokerage business attracted employees by offering them high salaries, while providing them with no supervision and establishing no internal controls over reporting revenue in connection with rental contracts.

93. Each rental broker was given a quota of closing one rental contract each week, a task that S8 described as unrealistic and beyond the capability of most brokers. He described the target of closing one rental contract each week as impossible given the fact that the rental market is limited: there are only so many apartments available for lease at a given time. This quota simply compelled brokers to fabricate contracts out of thin air. Because the team leaders were in turn required to meet the sales target for their team, they acquiesced in the fraudulent

conduct. Accordingly, the practice of "faking" contracts was not something that was done by rogue brokers, but was systematic.

94. In addition, S8 explained how the rental brokerage business provided SouFun with an opportunity to inflate revenues through fraud. All contracts for home sales must be approved by the Chinese government's real estate center- and it was therefore difficult to inflate revenue in those areas without fraud being detected by the government. Home rental contracts by contrast are unregulated by the Chinese government, leaving companies to their own devices with respect to the accuracy of revenue reporting.

***The Truth Comes To Light***

95. On October 27, 2015, at 10:30 am *SeekingAlpha.com* published a report on the Company entitled "Chinese Media Reports Allege 'Fake Contract' Trouble Brewing At Soufun" ("SeekingAlpha Report"), which asserts:

- Widespread layoffs at Soufun being reported in China have reportedly come as a result of "faked contracts" employees were involved in creating.

- Other outlets report that Soufun may have had knowledge that these fake transactions were taking place.
- Soufun has not made any disclosures in the U.S. regarding these layoffs and owes investors and regulators some answers.

96. The SeekingAlpha Report further revealed that on October 14, 2015, *SINA Finance*, a Chinese news website, published an article on the Company stating that:

> ……Up to 1,000 brokerage employees from SFUN's secondary housing business in the cities of Beijing, Shanghai and Chengdu received a layoff text message from the company on September 28,

> [2015]. SFUN says it fired these brokers due to faked contracts during their tenure at the company.
> (translated) (paraphrased).

97. The SeekingAlpha Report also revealed that on October 15, 2015, *Southern Metropolis Daily*, a reputable Chinese newspaper, published an article on the Company asserting that SouFun brokers reported that the Company acquiesced in this illegal activity which the employees were now being terminated for:

> ……part of the brokers told [the reporter] that they want to 'protest' because **SFUN has known these activities (fake contracts) all the time**, which is equal to an 'acquiescence'.
> (Emphasis added).

98. The SeekingAlpha Report also contained a quotation from an October 16, 2015 Chinese news article *Yicai.com* (a Chinese news website) which reported the following:

> On October 16, [2015], the department of publicity of SFUN wrote an email to China Business Daily that the firing [of employees] due to fake [contracts] recently is not the first time. In May of this year, broker Liu in the rental business department was found during a routine investigation to have 3 fake contracts out of 56 contracts in month of April, and [Liu] was fired by SFUN. In the same month, the investigation centered in the city of Shanghai sampled transacted contracts and found that three employees, including Chen, conducted photoshopping of ownership information in the submitted contract attachment [to the company], and the photo of three parties [in the

> transaction] was obtained online. These three employees were also fired due to fake contracts.
>
> Although both parties (meaning fired employees and the company) are holding up to their own argument, SFUN didn't give the exact number of the employees that have been fired.
> (paraphrased).

99. The SeekingAlpha article also contained excerpts from SouFun employee message board threads and photographs of SouFun employees protesting their terminations at SouFun's headquarters in several Chinese cities. The terminated employees claimed that they were fired for falsifying contracts which they did at the express direction of management. In particular, one Group chat entitled "SFUN Owes Employees Salary Complain" contained the following quotes from terminated employees: "'I have made no transactions for some time, then the manager called me out to ask me, 'Don't you know how to make some fake contracts? Download some real estate certificates and IDs online.'"…'The company pressures employees to make fake contracts to boost results. Now that the results are up, then [it is] killing the donkey (meaning firing the employee).'…'The branch office boss asked to make fake contracts, I am under pressure to get results.'"

100. On this news, shares of SouFun fell $0.26 per share or approximately 3.67% from its previous closing price to close at $6.82 per share on October 27, 2015.

101. Indeed, when it became publicly known that employees at SouFun were dismissed for faking contracts, the dismissed employees formed a protest group calling itself the "SouFun Formers Union" (translated) disclosing that SouFun management was complicit in and/or directed them to falsify contracts in order to generate fraudulent revenue.

102. In an attempt to salvage its reputation and cover up its role in the fraud, SouFun entered into secret deals with many of the dismissed employees in exchange for silence. According to S1 SouFun entered into secret deals with many of the dismissed employees whereby SouFun agreed to pay the salaries of the employees in exchange for silence. The fired employees signed contracts with SouFun, agreeing not to sue SouFun or publicly protest the fact that they were fired for falsifying contracts when in fact they were instructed to do so, in exchange for monetary remuneration. Since then, the public protests of SouFun and the issue in general has not so coincidentally quieted down.

103. According to a former broker at SouFun Shenzen (S8), SouFun ended its rental brokerage business as of the end of 2015, since most of the rental brokerage contracts were fraudulent, and any real revenue from SouFun's rental arm was therefore practically nonexistent.

104. According to S4, the actual number of rental brokers that have been fired from SouFun numbers about 2-3,000, approximately twice the figure reported in the media. Many of the fired employees have chosen to remain silent fearing that they would have difficulty finding work in the industry. The firings were not isolated to employees in one particular city. Instead, they occurred in ***all*** eleven of the cities across China where SouFun operated rental brokerages.

105. According to SouFun's 2014 Form 20-F, SouFun had 11,642 employees in total as of December 31, 2014, 4,468 of whom were part of the sales and marketing department. The termination of 2,000 employees therefore represents over 17% of SouFun's ***entire*** 2014 workforce and 45% of its sales and marketing department.

106. SouFun published a press release on October 28, 2015, painting a picture of itself as a having a zero tolerance policy for fraud of any kind. The Company press release stated that the "company has been implementing strict

internal control over transactions" and "removing and firing those employees who did not behave accordingly has been in place since the beginning of the year."

107. However, while SouFun touted its "Anti-corruption Investigations Office," according to a former Human Resources manager at SouFun (S3), that office did not exist prior to disclosure of the rental contract fraud. Accordingly, SouFun has created the office after the fact, in an attempt to paint itself as a Company that is concerned with corrupt and illegal practices and distance itself from the fraud.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

108. In its First quarter 2015 financial results SouFun for the first time began to report GMV. On May 20, 2015 SouFun issued its first quarter results on Form 6-K filed with the SEC reporting the following GMV for the months of January, through April, showing rapid growth in GMV each month as follows:

GMV: January-April, 2015 (in millions of US dollars)

| | **January** | **February** | **March** | **April** | **Total** |
|---|---|---|---|---|---|
| **New Home *** | 340 | 299 | 642 | 794 | 2,075 |
| **Secondary Home** | 22 | 42 | 320 | 705 | 1,089 |
| **Home furnishing** | 1 | 1 | 2 | 5 | 9 |
| **Total** | **363** | **342** | **964** | **1,504** | **3,173** |

* Only including direct sales services.

109. SouFun's total reported GMV for the first quarter of 2015 ended March 31 was $1.7 billion. According to SouFun's first quarter 6-K "Starting from the beginning of this year, the company's e-commerce business expanded into its

new home, resale and rental, and home furnishing business lines across China's major cities." CEO Mo stated that in "aggressively penetrating" into this new business "we added more than 11,000 employees with attractive incentives this year to support our e-commerce expansions and we will continue to expand our e-commerce staffs to keep the current momentum." The Company's May 20 Press Release filed with the SEC included first quarter highlights for, inter alia, total revenue: "Total revenue increased by 1.8% year-on-year to $123.5 million for the three months ended March 31, 2015. Revenue from e-commerce services increased by 75.2% year-on-year to $51.5 million for the three months ended March 31, 2015."

110. The May 20, 2015 Press Release and the May 20, 2015 6-K were materially false and misleading and/or omitted material information because: 1) SouFun's GMV was materially overstated because it included millions of dollars in GMV recorded for nonexistent rental contracts that were fabricated at the behest of SouFun management; 2) SouFun's e-commerce revenue improperly included revenue from nonexistent rental contracts that were fabricated at the behest of SouFun management; 3) the expansion of the e-commerce business into the rental market was accompanied by 95% of rental employees fabricating rental contracts; and 4) at least 2,000 of the 11,000 new employees added "with attractive incentives" were supporting the e-commerce business by fabricating rental contracts.

111. In SouFun's First Quarter 2015 Earnings Conference Call CEO Mo touted SouFun's successful debut of its new business, emphasizing that he was determined to make the Company number one in the new home, resale, rental and home furnishing business.

112. With respect to SouFun's rental business, deputy CFO Lei Hua highlighted the numbers concerning SouFun's rental transactions: "SouFun started to provide rental transaction service with free commission fee in Beijing and

Shanghai since January. ***In the first quarter, our in-house rental team finished 7,900 city transactions totally in those two cities.***" CEO Mo added "***we have seen very good signs from the local markets like in the rental market in Beijing and Shanghai, we are the number one players now for the rental market***…So to be the number one, number two players across the country, that's definitely the goal in our mind and that's the goal of the Company. So we are moving towards that target."

113. The above statements were materially false and misleading because the in-house rental team did not finish 7,900 transactions in Beijing and Shanghai since January: many of those transactions were completely fabricated. SouFun was also not number one in the rental market for Beijing and Shanghai because many of the rental contracts in those markets were fake contracts that did not exist.

114. During SouFun's Q1 2015 Earnings Conference Call Defendant Mo responded to a question by an analyst expressing skepticism related to SouFun's secondary home market business:

> Q: "And actually And I do believe many people have this question mark, and I think about you're going to grow this business into a profitable business and big market share and to you look at this market and certainly it's not as appealing as the new home market.
>
> And plus business model wise, you're like almost built from scratch, build up your agencies across the country and lot of things, definitely is not so clear to investors. I want to ask you a question, why you are determined to do this type of business, what do you see in this market that if you said you'll have to do it and how do you mission feel for the future in this part of business and how you will be stationing yourself from others, how you will win this market? That's my question.

Mo responded:

> Resale market is definitely the future of China's property market, so that will become - it is moving in that direction, which is very apparent now. So to emphasize or to put in a resale market as one of our major thing into the future that definitely I think is right for us. ***And since we have started doing this transaction through our online platform we are seeing very good signs in the past four months.***
>
> And we can deliver at a very high growth rate months by months. So it is tough and we started from scratch, but you know, we know how to learn to do things quickly and we also hired, as I mentioned in our press release, ***we hired qualified executives from traditional agency business. And we hired 11,000 people and most of them are experienced agents.***
>
> And by combining SouFun's Internet and mobile advantages and its technology platforms and with traditional brokerage or agency businesses so that is going to make sure that going forward we can move quickly and occupy or take the market share from traditional players in the market.
>
> So with all of those in mind, it is the Company's also myself's determination to move forward definitely without doubt.

115. Defendant Mo's statement above was materially false and misleading because: 1) the executives from traditional agencies and so-called "experienced agents" were not reputable professionals but were instead engaging in the widespread practice of fabricating rental contracts; 2) the "good signs" and growth in the rental market was not built from scratch or attributable to SouFun's Internet

and mobile advantages and technology platforms, rather it was the result of the widespread practice of rental brokers fabricating rental contracts.

116. On August 7, 2015 SouFun issued a press release and Form 6-K filed with the SEC announcing its Second Quarter 2015 results for the three months ended June 30, 2015. SouFun reported that GMV increased by 306.7% from $1.7 billion in the first quarter of 2015 to $6.8 billion in the second quarter and provided the following table breaking down GMV per segment on a monthly basis and providing a table showing the astounding variance:

117. GMV: January-June, 2015 (in millions of US dollars)

| | **January** | **February** | **March** | **April** | **May** | **June** |
|---|---|---|---|---|---|---|
| **New Home *** | 340 | 299 | 642 | 794 | 1,131 | 1,516 |
| **Secondary Home** | 22 | 41 | 321 | 705 | 1,138 | 1,478 |
| Secondary home sales | 20 | 36 | 282 | 637 | 1,002 | 1,324 |
| Rental | 2 | 5 | 39 | 68 | 136 | 154 |
| **Home furnishing** | 1 | 1 | 2 | 5 | 9 | 9 |
| **Total** | **363** | **341** | **965** | **1,504** | **2,278** | **3,003** |

| | **2015Q1** | **2015Q2** | **Variance** | |
|---|---|---|---|---|
| | | | **amount** | **%** |
| **New Home *** | 1,281 | 3,441 | 2,160 | 169 % |
| **Secondary Home** | 384 | 3,321 | 2,937 | 765 % |
| secondary home sale | 338 | 2,963 | 2,625 | 777 % |
| rental | 46 | 358 | 312 | 678 % |
| **Home furnishing** | 4 | 23 | 19 | 475 % |
| **Total** | **1,669** | **6,785** | **5,116** | **307 %** |

118. The above chart shows how rapidly SouFun's new business was growing, broken down by segment. The Secondary Home business grew the most, with the rental division of Secondary Home increasing by an astonishing 678% from the first to second quarter.

119. Additionally, SouFun reported "Total Revenue increased by 25.4% year-on-year to $210.9 million. ***Revenue from e-commerce services increased by 119.7% year-on-year to $106.8 million.*** (emphasis added).

120. The August 7, 2015 Press Release and Form 6-K filed with the SEC was materially false and misleading and/or omitted material information because: 1) SouFun's GMV was materially overstated because it included millions of dollars in GMV recorded for nonexistent rental contracts that were fabricated at the behest of SouFun management; 2) SouFun's e-commerce revenue improperly included revenue from nonexistent rental contracts that were fabricated at the behest of SouFun management.

121. The April 7, 2015 6-K quotes CEO Mo as stating in part: "The Q2 numbers showed that the company is quite on track in its transformation from a pure internet platform to a more transaction oriented platform across new, resale, rental homes and home furnishing plus financial services among China's major cities… We will continue our efforts in building up transaction teams, adding transaction model to more cities, and speeding up development of our technology platforms and tools to support the transformation.

122. The above statement by Defendant Mo was materially false and misleading and/or omitted material information because the Company's transformation was not on track, instead, 95% of SouFun's rental brokers were creating fake contracts in order to meet impossible sales targets set by management, and the Company was undergoing chaos amidst its attempted transformation.

123. On SouFun's 2Q 2015 Earnings Conference Call, Defendant Mo discussed how SouFun compensated its brokers, stating that SouFun pays its brokers a higher salary than competitors while charging clients a lower commission. He commented on the fact that the volume of transactions per month would enable SouFun to charge customers a lower commission while still remaining profitable: "But as you know, our 0.5% is lower than the traditional agency companies. But we believe because of the efficiencies, things like in the resale market, we are thinking about – we are moving toward three transactions per agent per month, but a traditional agency business agent, they are having one transaction per three months, per quarter. So, that's how are we going to move this transaction business forward." Mo also stated, in response to an analyst's question concerning increase in transactions per agent and efficiency: "this is the key actually to win this market…increase the efficiency of each agent is a tough task for us. ***The good thing is that even after only six months we are better than the average efficiency of this market."***

124. Defendant Mo's above statement that "after only six months we are better than average efficiency of this market" was materially false and misleading and/or omitted material information because SouFun's secondary home brokerage business (which includes rentals) was not more efficient than the "average efficiency" and the appearance of increased efficiency in the rental brokerage arm of the secondary home business was attributable to the fact that 95% of SouFun's rental brokers were fabricating rental contracts.

125. On the 2Q 2015 Earnings Conference Call Mo discussed the rental business specifically, stating that after 6 months "we have been doing over 45,000 transactions in the rental part…because of this high volume of transactions, there it will bring some multiple value added services to us."

126. The above statement was materially false and misleading and/or omitted material information because SouFun was not doing over 45,000 rental transactions; instead the true number of rental transactions was significantly lower.

## VII. DEFENDANTS FALSE STATEMENTS WERE MADE WITH SCIENTER

127. The materially false and misleading statements in the Company's Forms Q1 2015 6-K filed with the SEC, Form Q2 2015 6-K filed with the SEC and Q1 and Q2 2015 Earnings Conference Calls regarding SouFun's GMV, revenues from e-commerce, and growth in the rental market, *inter alia*, were made with scienter. Defendants were at least deliberately reckless as to their falsity because as discussed above, Defendants were intently focused on the performance of the Company's new direct brokerage business given their primary goal of transitioning the Company into a full-scale 020 model. The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiffs and the Class.

128. In addition to the foregoing allegations, the following facts support a strong inference that SouFun and the Individual Defendants knew, or with deliberate recklessness disregarded, that the challenged statements alleged herein were materially false or misleading when made.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

***The Magnitude and Pervasiveness of the Fraud Supports and Inference of Scienter***

129. CEO Mo repeatedly stated on conference calls that SouFun's transformation and the costs associated therewith required the hiring of 11,000 employees, which in turn contributed to the Company's much lower margins as it transformed its business. S1 reports that 95% of the employees hired in the rental brokerage business were creating rental contracts out of thin air. The fact that such a large percentage of SouFun's newly hired employees engaged in such blatant misconduct indicates that Defendants were either aware of, or recklessly disregarded the fact that this misconduct was occurring. Additionally, S1 indicates that the misconduct was not isolated to rental brokers in just a few cities but pervaded SouFun's business throughout all cities in which it had a presence in China. S8 stated (and other sources concur) that the fraud in the rental business began almost at its inception. That the fraud at the Company was so ongoing and pervasive indicates that Defendants were either aware of it or recklessly disregarded its existence.

***Bribing Former SouFun Employees to Remain Silent Supports Scienter***

130. After the SeekingAlpha story broke, on October 28, 2016 Defendants issued a press release stating that the Company implements a "zero tolerance" policy with respect to employee integrity and ethics, and that a monthly human resources evaluation and the practice or firing and removing employees who did not behave in accordance with the Company's policy on integrity and ethics has been in place since the beginning of 2015. But S2 (a former senior sales manager at SouFun's Shanghai division) tells a very different story. According to S2, SouFun created the "anti-corruption investigations office" only after it was revealed in the media that SouFun's rental brokers were fabricating contracts. Employees who were fired from SouFun after the fraud was publicly revealed received text messages from the "anti-corruption investigations office" and

because the office never existed before, employees who received those messages were initially confused, until they realized that the "anti-corruption investigations office" was a newly created department by SouFun, created to cover up Defendants' fraud.

131. S2 (former deputy general manager and president at SouFun's Chengdu branch) stated that many employees were extremely angry when they were fired, because they were explicitly told by their regional managers to create fake contracts. When they were fired they held public protests not only to obtain wages they felt were owed to them but also an explanation from management as to why they were fired for a practice that they were instructed to engage in. In order to gain those employees' silence S2 indicated that SouFun entered into secret deals with the employees that involved unspecified payments to them in exchange for ceasing their protests.

***Defendant Mo's Hand-On Management Style Supports an Inference of Scienter***

132. Defendant Mo is not only the CEO of SouFun but he is the Company's founder. Numerous sources interviewed who are former SouFun employees corroborate the fact that Mo was a hands-on CEO.

133. It was Defendants Mo's stated vision to make SouFun number one in the rental division and to successfully transform the Company into an "020" business dominating the market in the direct real estate sales and rental brokerage business.

134. Defendant Mo frequently displayed his knowledge as to the Company's rental segment. For example, on SouFun's August 9, 2015 2Q 2015 Earnings Conference Call Mo explained that rental division would be extremely profitable for SouFun given the fact that many families in China have multiple apartments that they rent out and that SouFun would rent out those apartments for

five years collecting a 10% of the total annual rent. Coupled with the annual increases in rent and given that SouFun purportedly already had over 5,000 units under its management Mo touted the rental business as a very attractive component of SouFun's new business model:

> Because in China, you know, there are many families and people, they have multiple apartments, the homes in the market, they don't – actually, they don't care and they do not even rent out. And we started testing that we can take – they can – they can dedicate or give their apartments in our database and under our management. So, for five years or something, we can make one month rent out of their 12 months rent, so which is about close to 10% of the total annual rental fee. Plus, every year, there will be some rental increase and especially in the big cities in China. ***So, that part becomes very attractive to us now. And currently, we have over 5,000 units under our management. We started only two months ago. So, I would hope that someday we can have 0.5 million units or apartments or homes under our management or even 1 million homes under our management***... I think that basically it will be a very profitable business going forward.

(emphasis added).

## IX. LOSS CAUSATION

135. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

136. During the Class Period, investors and analysts were focused on the Company's business transition, particularly with respect to the Secondary Housing

business, of which rentals is a part, and the growth in the Company's GMV in its Secondary Housing segment.

137. The damages suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to recognize revenue based upon non-existent rental contracts and to make its business transition appear to be more successful than it was in reality based upon growth in the Secondary Housing segment that was attributable to fraudulent rental contracts, and the subsequent decline in the value of SouFun securities when the truth regarding the widespread fraud in the Company's rental segment was revealed.

138. On October 27, 2015, at 10:30 am *SeekingAlpha.com* published a report on the Company entitled "Chinese Media Reports Allege 'Fake Contract' Trouble Brewing At Soufun" ("SeekingAlpha Report"), which asserts:

- Widespread layoffs at Soufun being reported in China have reportedly come as a result of "faked contracts" employees were involved in creating.

- Other outlets report that Soufun may have had knowledge that these fake transactions were taking place.
- Soufun has not made any disclosures in the U.S. regarding these layoffs and owes investors and regulators some answers.

139. The SeekingAlpha Report further revealed that on October 14, 2015, *SINA Finance*, a Chinese news website, published an article on the Company stating that:

> ……Up to 1,000 brokerage employees from SFUN's secondary housing business in the cities of Beijing, Shanghai and Chengdu received a layoff text message from the company on September 28,

> [2015]. SFUN says it fired these brokers due to faked contracts during their tenure at the company.
>
> (translated) (paraphrased).

140. The SeekingAlpha Report also revealed that on October 15, 2015, *Southern Metropolis Daily*, a reputable Chinese newspaper, published an article on the Company asserting that SouFun brokers reported that the Company acquiesced in this illegal activity which the employees were now being terminated for:

> ……part of the brokers told [the reporter] that they want to 'protest' because **SFUN has known these activities (fake contracts) all the time**, which is equal to an 'acquiescence'.
>
> (Emphasis added).

141. The SeekingAlpha Report also contained a quotation from an October 16, 2015 Chinese news article *Yicai.com* (a Chinese news website) which reported the following:

> On October 16, [2015], the department of publicity of SFUN wrote an email to China Business Daily that the firing [of employees] due to fake [contracts] recently is not the first time. In May of this year, broker Liu in the rental business department was found during a routine investigation to have 3 fake contracts out of 56 contracts in month of April, and [Liu] was fired by SFUN. In the same month, the investigation centered in the city of Shanghai sampled transacted contracts and found that three employees, including Chen, conducted photoshopping of ownership information in the submitted contract attachment [to the company], and the photo of three parties [in the transaction] was obtained online. These three employees were also fired due to fake contracts.

> Although both parties (meaning fired employees and the company) are holding up to their own argument, SFUN didn't give the exact number of the employees that have been fired.
>
> (paraphrased).

142. The SeekingAlpha article also contained excerpts from SouFun employee message board threads and photographs of SouFun employees protesting their terminations at SouFun's headquarters in several Chinese cities. The terminated employees claimed that they were fired for falsifying contracts which they did at the express direction of management. In particular one Group chat entitled "SFUN Owes Employees Salary Complain" contained the following quotes from terminated employees: "'I have made no transactions for some time, then the manager called me out to ask me, 'Don't you know how to make some fake contracts? Download some real estate certificates and IDs online.'"…'The company pressures employees to make fake contracts to boost results. Now that the results are up, then [it is] killing the donkey (meaning firing the employee).'…'The branch office boss asked to make fake contracts, I am under pressure to get results.'"

143. On this news, shares of SouFun fell $0.26 per share or approximately 3.67% from its previous closing price to close at $6.82 per share on October 27, 2015.

## X. PLAINTIFFS' CLASS ACTION ALLEGATIONS

144. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased SouFun ADS securities between May 20, 2015 and October 27, 2015 inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs,

successors or assigns and any entity in which Defendants have or had a controlling interest.

145. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SouFun's ADS were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of SouFun ADS were traded publicly during the Class Period on the New York Stock Exchange. During the Class Period, SouFun had 291,824,685 ADS outstanding. Record owners and other members of the Class may be identified from records maintained by SouFun or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

146. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

147. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

148. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SouFun;

(c) whether the Individual Defendants caused SouFun to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of SouFun ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f) to what extent the members of the Class have sustained damages and the proper measure of damages.

149. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

150. The market for SouFun's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, SouFun's securities traded at artificially inflated prices during the Class Period. On June 12, 2015, the Company's ADSs closed at a Class Period high of $9.95. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of SouFun's securities and market information relating to SouFun, and have been damaged thereby.

151. During the Class Period, the artificial inflation of SouFun's ADSs was caused by the material misrepresentations and/or omissions particularized in this

Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SouFun's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of SouFun and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company ADSs. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

152. At all relevant times, the market for SouFun's securities was an efficient market for the following reasons, among others:

(a) SouFun's ADSs met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b) as a regulated issuer, SouFun's filed periodic public reports with the SEC and/or the New York Stock Exchange;

(c) SouFun regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) SouFun was followed by at least 7 securities analysts employed by brokerage firms who wrote reports about the Company during the Class Period, including JP Morgan, Credit Agricole, T.H. Capital, Barclays, Macquarie, Brean Capital and Deutsche Bank, and these reports were distributed to the sales force and certain customers of their respective

brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(e) On average, 16.5% of SouFun's outstanding ADSs were traded weekly; permitting a very strong presumption of that its shares traded on an efficient market;

(f) New company-specific information was rapidly reflected in SouFun's ADS price.

153. As a result of the foregoing, the market for SouFun's securities promptly digested current information regarding SouFun from all publicly available sources and reflected such information in SouFun's share price. Under these circumstances, all purchasers of SouFun's securities during the Class Period suffered similar injury through their purchase of SouFun's securities at artificially inflated prices and a presumption of reliance applies.

154. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects - information that Defendants were obligated to disclose - positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. NO SAFE HARBOR

155. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SouFun who knew that the statement was false when made.

## XIII. COUNTS

### FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

156. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

157. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase

SouFun’s securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

158. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SouFun’s securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

159. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SouFun’s financial well-being and prospects, as specified herein.

160. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of SouFun’s value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about SouFun and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

161. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

162. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SouFun’s financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

163. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of SouFun’s securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired SouFun’s securities during the Class Period at artificially high prices and were damaged thereby.

164. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that SouFun was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their SouFun securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

165. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

166. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

167. This action was filed within two years of the discovery of the fraud and within five years of each plaintiff’s purchases of securities giving rise to the cause of action.

## SECOND CLAIM

## Violation of Section 20(a) of The Exchange Act Against the Individual Defendants

168. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

169. The Individual Defendants acted as controlling persons of SouFun within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

170. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

171. As set forth above, SouFun and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct

and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

172. This action was filed within two years of discovery of the fraud and five years of each of plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: March 25, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
Phillip Kim, Esq.
Sara Fuks, Esq. (admitted *pro hac vice*)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Michael Goldberg, Esq. (SBN 188689)
**GOLDBERG LAW PC**
13650 Marina Pointe Dr. Suite 1404
Marina Del Rey, CA 90292
Phone: 1800-977-7401
Fax: 1800-536-0065

*Co-Lead Counsel for Plaintiffs*

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against SouFun Holdings Limited. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The SouFun Holdings Limited. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

**First name:** ling
**Middle initial:**
**Last name:** li
**Address:** REDACTED
**City:** [redacted]
**State:**
**Zip:**
**Country:**
**Facsimile:**
**Phone:**
**Email:**

Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 5/25/15 | 1000 | 7.99 |
| Common Stock6/11/15 | 500 | 9.08 | |

7. I have not served as a representative party on behalf of a class under the federal security laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate: **YES**

## Certification for ling li (cont.)

By clicking on the button below, I intend to sign and execute this agreement and retain the Rosen Law Firm, P.A. to proceed on Plaintiff's behalf, on a contingent fee basis. **YES**

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform Electronic Transactions Act as adopted by the various states and territories of the United States.

Date of signing: 12/17/2015



## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SERCURITIES LAWS** will be sent electronically to the registered participants identified in the Notice of Electronic Filing (NEF).

Dated March 25, 2016 *<u>/s/Sara Fuks</u>*